**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

SCOTTSDALE INSURANCE COMPANY,    )
           )
       Plaintiffs,       )
           )
    vs        )     Case No. 06-1009-WEB
           )
REBECCA McREYNOLDS,      )
           )
       Defendants.     )
           )

**MEMORANDUM AND ORDER**

On October 15, 2007, Plaintiff, Scottsdale Insurance Company, and Defendant, Rebecca McReynolds, each moved for summary judgment in their favor in the above titled action.  This order addresses both Defendant's motion (Doc. 66) and Plaintiff's motion (Doc. 67).[1]

## I. BACKGROUND AND FACTS

This case concerns a dispute as to whether Scottsdale Insurance Company (hereafter, "Scottsdale" or "Plaintiff") should pay Rebecca McReynolds (hereafter, "McReynolds" or "Defendant") under an insurance contract for the loss of her home by fire.  In Scottsdale's motion it argues that McReynolds violated exemption clauses in her home insurance policy which consequently terminated the policy and any claims made under it.  Scottsdale asks for an order recognizing that it owes no coverage under the policy.  (Doc. 67 at 2).

McReynolds' summary judgment motion (Doc. 66) argues that she in fact substantively violated no exemption clauses and that Scottsdale's failure to fully pay on the contract was a

---

[1]   All references to Document 67 refer to the Memorandum Brief attached to the underlying Motion for Summary Judgment by Scottsdale.  The attached exhibits are referred to as they are numbered in such Memorandum.

violation of Scottsdale's duties.  She asks this Court for an order directing monies owed under the policy to be disbursed in her favor. (Doc. 66 at 1-2).

The facts surrounding this case are as follows.  Scottsdale is an insurance company incorporated in the State of Ohio and authorized to transact business in the State of Kansas. McReynolds is currently a resident of Arlington, Kansas.  In 2003, Defendant applied for a policy of homeowners insurance with Eck Insurance Agency to insure her residence located at 25210 Pretty Prairie Road, Cunningham, Kansas 67035.

McReynolds was approved for a $36,000 loan for home improvements in July 2004. (Doc. 70, ¶4).   Scottsdale issued a homeowner's insurance policy to defendant with the effective dates from November 17, 2004 through November 17, 2005.  The Scottsdale policy issued to defendant is identified by policy number HOS0323561. (Doc. 67, Ex.5)(Doc. 70, Ex.48).  The Schedule of Mortgagees, Additional Insureds, and Lienholders to said policy listed the following as a mortgagee: CITIZENS BANK OF KANSAS, ISAOA, PO BOX 436 KINGMAN, KS 67068.         On the evening of November 27, 2004, McReynolds was home alone when she went to bed around 8:00 p.m.(Doc. 70, ¶10)(Doc. 70, Ex. 36 at 14) (Doc. 70, Ex.37 at 2).  She alleges that while asleep, she was awoken around 11:00 p.m. upon hearing male voices in her living room. (Doc. 70, ¶11)(Doc. 70, Ex.37 at 2).  She then got out of bed and closed her bedroom door moments before an intruder attempted to come in through the door.  She kept the intruder at bay by sitting with her back to the door. (Doc. 70, ¶11). At this time she also discerned there was a fire in the house through hearing crackling sounds of fire and seeing a glow from a hole in her bedroom door. (Doc. 70, ¶¶11, 12).  While overcoming the intruder's advances on the door, she phoned 911 dispatch requesting help from the intruders and calling in

the fire.(Doc. 70, ¶11).

At some point before the house was consumed and after the intruder(s) had quit trying to get in, she escaped out of her bedroom window.  She never saw or heard the alleged intruders leaving her property once outside. (Doc. 70, ¶13).  The first individuals on the scene of the fire were her parents.[2]  (Id.).

After emergency crews arrived that evening, McReynolds sat in a police car with an officer relaying her version of the events leading to the fire. (Doc. 70, ¶14).  While discussing how the fire occurred with the officer she noticed a distinct smell of kerosene and proceeded to tell the officer she realized it was her shirt emanating the odor of kerosene. (Id.).  She attributed the smell to smoke from her house fire, which she concluded must have been ignited by the intruders using her kerosene lamps.  (Doc. 70, ¶14)(Doc. 70, Ex. 5).

McReynolds has a documented history of psychological episodes. (Doc. 70, ¶15).  She has been diagnosed with dissociative disorder by a licensed psychologist, Dr. Ted Moeller, and has a history of dissociative experiences, including described incidents of self-mutilation or superficial/moderate self-injurious behaviors.[3]  (Doc. 70. Ex. 6, Moeller Report).  When McReynolds is in a dissociative state, she is not able to remember her actions.  Dr. Moeller has stated that if McReynolds had a dissociative episode the night of the fire, she would not have

---

[2]   McReynolds deposition states that she did not remember when her parents' car arrived.  (Doc. 70, Ex. 4).
[3]   McReynolds recalls three incidents of self-mutilation prior to the subject fire in November, 2004. Specifically, in 1993, the defendant recalled stabbing or cutting herself, claiming she had been attacked, filing a police report and later admitting that no attack had occurred. In addition, in 2002, around the time of her divorce, the defendant recalled waking up and finding cuts on her arm. In January or February of 2004, the defendant recalled cutting herself. After each of the last two incidents, the defendant sought psychological treatment with Horizons, where she was told these incidents were the result of "emotional pain." After the final incident, the defendant was prescribed medication for depression, which she stopped taking because she "had gotten over the worst of it." (Doc. 67, ¶15) (Doc. 67, Ex. 2, 4/26/07 Dep. at. 76-81).  While this information was controverted in McReynolds' Response (Doc. 70) her deposition testimony  supports the truthfulness of these facts. (Id.).

3

been aware of what she was doing or what was going on around her. (Id.) (Doc. 70. Ex. 6, Moeller Report).

The day of the fire, McReynolds' ex-boyfriend of a month, Tom Helm, who had been living with her and paying $200 a month rent, was at her house as a result of helping her unlock her keys from inside her car earlier that day.[4]  (Doc. 70,¶16).  Before leaving her home that day, Helm retrieved the last of his stuff he had left from when he was living there. (Doc. 70,¶16)(Doc. 70, Ex. 8.).

The day after the fire, the Eck Insurance turned a claim into Scottsdale's office and notified it that the fire was of unknown origin. (Doc. 70, Ex.17).  Scottsdale hired Crawford Company to provide its services as independent adjusters on the claim. (Doc. 70, Ex. 18).  On December 1, 2004, Dan Bowker (hereafter "Mr. Bowker), a special investigator for Crawford interviewed McReynolds. (Doc. 70, Ex. 37).  On December 6, 2004, Scottsdale sent McReynolds a letter stating the investigation of the claim was ongoing and that a local, licensed and independent adjuster had been hired to investigate.  In this letter, Scottsdale specifically reserved its rights to assert any defenses or exclusions under the policy. (Doc. 67, Ex. 10).

On January 2, 2005, Dave Higday of the Kansas Fire Marshal's office filed his initial report on the investigation of the fire. (Doc. 67, Ex. 7). This report included information gained from interviews of McReynolds taken by Reno County Detective Dana Skomal and Kansas State Fire Marshall Melvin Dale within roughly 24 hours of the fire. (Id at 4).  Higday's

---

[4]  Mr. Helm had previously been caught having a relationship outside of his relationship with the defendant. The defendant testified that despite the break up, she was not upset the day of the fire regarding these events in her personal life. (Doc. 70, Ex. 7,8,9)

report concluded  that the fire was the result of arson, that the defendant had started the fire, and that McReynolds' version of the story was not credible. (Doc. 70, Ex. 7 at 16).[5]

Around January 24, 2005, Scottsdale paid part of McReynolds' claim by issuing a check for $27,551.37 to Citizens Bank of Kansas to pay off the balance of McReynolds' line of credit (mortgage).  (Doc. 67, Ex. 11).

On February 1, 2005, Dan Scott, of Crawford Company, conducted an interview of McReynolds in her parents' home, with her parents present. (Doc. 70, ¶24)(Doc. 70, Ex.36).  On February 2, 2005, Marshal Higday, and Sheriff Skomal, again interviewed the defendant.  In this taped interview, she stated that her burning down the house was a possibility but that to the best of her knowledge she did not believe she had caused the fire. (Doc. 70,¶25).

McReynolds signed and submitted a Sworn Statement in Proof of Loss to Scottsdale (Doc. 70, Ex. 39) and an Access Authorization form granting Mr. Bowker access to her home to conduct an inspection and take photographs. (Doc. 70, Ex. 40.)  She also claims to have sent a Personal Property Inventory to Scottsdale. (Deposition of McReynolds at 20, Ex. 32.)

McReynolds was required under her policy to cooperate with Scottsdale by, among other things: submitting to an examination under oath, providing documents and releases associated with the claim, and submitting an inventory of personal property claimed from the fire.  *See* Homeowner's Insurance Policy, (Doc. 70, Ex. 48 at 8-9). (Doc. 67, Ex. 5).

On March 9, 2005, McReynolds' legal representative, Stanley Juhnke (hereafter "Mr. Juhnke") sent a demand letter for full payment under the policy. (Doc 67, Ex. 13).  The letter indicated that it was counsel's understanding that McReynolds had provided a personal property

---

[5]   McReynolds objects to admitting any conclusions of the State Fire Marshal on grounds that these statements qualify as expert testimony and that David Higday was not designated an expert pursuant to Fed. R. Civ. Pro. 26(a)(2)(A) and Fed. R. Evid. 702.

list and that if any additional information was needed to contact Mr. Juhnke. (Id.).  McReynolds stated that after submitting her personal property inventory she knew she was going to have to continue to work with the insurance company to finalize and complete the inventory.  (Doc. 67, Ex. 15 at 80).

On March 14, 2005, Scottsdale sent a letter to Juhnke indicating it had not received a list of claimed personal property. (Doc. 67, Ex. 14).  On April 15, 2005, Scottsdale sent a letter to Mr. Juhnke giving notice to McReynolds of its intent to conduct an examination under oath and requesting McReynolds sign a release for access to the insurance agent's file, the bank's file, and any statements she may have given.  (Doc. 67, Ex.16).

On May 4, 2005, a charge of arson was filed against McReynolds in Reno County, Kansas, District Court case number 05 CR 377. (Doc. 70, Ex. 28).  Scottsdale sent a follow up letter requesting signed releases on May 19, 2005 and then again on June 24, 2005.   (Doc. 67, Ex. 17,18).  On June 27, 2005, Mr. Juhnke responded by letter stating McReynolds was facing criminal charges and that he would not be proceeding with her civil claims until the criminal case was resolved.  (Doc. 67, Ex. 19).  In a letter to Mr. Juhnke, dated August 8, 2005 from Scottsdale, it stated Juhnke's June 27th correspondence regarding McReynolds' "not moving forward" was "construed as a refusal" by his client to "provide a release of information that was previously requested."  (Doc. 67, Ex 20).

On January 11, 2006, Scottsdale filed the Complaint giving rise to this case.  In the Complaint, Scottsdale demanded a declaration that it had no duty to pay McReynolds under the policy.  (Doc. 70, Ex.44).  January 16, 2006, Scottsdale sent McReynolds a letter denying the remainder of her claim. (Doc.67, Ex.22).  The letter stated that its reason for denying the claim

was the insured's violating the Intentional Loss clause by committing arson and her failure to cooperate in violation of the contract.  (Id).

Kansas District Court Judge Steven Becker held a preliminary hearing in the state arson case on January 23, 2006.  McReynolds' insurance agent, May VanHorn, testified at the preliminary hearing that McReynolds' home was under insured at the time of the fire. (Doc. 66, Ex. 25 at 12).  Detective Diana Skomal also testified at the preliminary hearing that McReynolds never told Skomal that she started the fire that destroyed her home.(Doc. 66, Ex. 25 at 45). Judge Becker found that the prosecution had failed to prove the element of "intent to defraud" under the charge and dismissed the case.  (Doc. 66, Ex. 25 at 146).

On November 9, 2006, Scottsdale amended its complaint wherein it added to its request for a declaratory judgment that it recover $32,551.37 that it claims to have paid out and praying for an equitable mortgage/lien of real property in the amount of $27,551.37, the amount paid to McReynolds' mortgage company.   (Doc. 70, Ex. 45).  On November 29, 2006, McReynolds answered the complaint and counterclaimed, alleging that Scottsdale breached the insurance contract by denying the large part of her claim for the loss of her home. (Doc. 16).

The pertinent portions of the insurance policy surrounding the dispute reads as follows:

**SECTION I - EXCLUSIONS**

We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area . . .

**8. Intentional Loss**
Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.
In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

7

In addition to outlining specific exclusions to coverage, the policy specifically outlined certain conditions and duties by an insured following a loss:

## SECTION 1 - CONDITIONS

. . .

### B. Duties After Loss

In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "Insured" seeking coverage, or a representative or either: . . .

**5.** Cooperate with us in the investigation of a claim;

**6.** Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory; . . .

**7.** As often as we reasonably require: . . .
>    **b.** Provide us with records and documents we request and permit us to make copies; and
>    **c.** Submit to the examination under oath, while not in the presence of another "insured", and sign the same . . .

### K. Mortgage Clause
**1.** If a mortgage is named in this policy, any loss payable under Coverage **A** or **B** will be paid to the mortgagee and you as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages . . .

**4.** If we pay the mortgage for any loss and deny payment to you
>    **a.** We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or
>    **b.** At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this even, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt. . . .

### Q. Concealment Or Fraud

We provide coverage to no "insureds" under this policy if, whether before
or after a loss, an "insured" has:
**1.** Intentionally concealed or misrepresented any material fact
or circumstance;
**2.** Engaged in fraudulent conduct; or
**3.** Made false statements; . . . relating to this insurance.
( Doc. 70, Ex. 48)(Doc.67 Ex. 5).

## II.  SUMMARY JUDGMENT

Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *See*

Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Vitkus v.*

*Beatrice Co.,* 11 F.3d 1535, 1538-39 (10th Cir.1993).  A factual dispute is "material" only if it

"might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. A

"genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of

material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Hicks v. City of  Watonga,* 942

F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the

nonmoving parties to demonstrate that genuine issues remain for trial as to those dispositive

matters for which they carry the burden of proof. *Applied Genetics Int'l, Inc. v. First Affiliated*

*Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir .1990); *see also Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.,* 475 U.S. 574, 586-87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d

887, 891 (10th Cir.1991). The nonmoving parties may not rest on their pleadings but must set

forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving parties' evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250-51.

"In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 n. 3 (10th Cir.1992); *accord Annett v. Univ. of Kan.,* 371 F.3d 1233, 1237 (10th Cir.2004) (noting that "unsupported conclusory allegations ... do not create a genuine issue of fact") (internal citation and quotation marks omitted).

Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52.

### III. JURISDICTION

This court maintains jurisdiction under Title 18 U.S.C. §1332, as the parties are from different states and the amount in controversy exceeds $75,000.  Under choice of law precedent, Kansas substantive law controls all claims.

### IV. DISCUSSION OF CLAIMS

As previously stated, Scottsdale moves the court for a declaratory judgment that it owes no duties under the policy. (Doc. 67 at 2).  The court must first address Scottsdale's summary judgment motion to determine that an enforceable insurance policy is in place before considering

McReynolds' motion for summary judgment on her counter-claim for an order on the policy.

### A. Non-Cooperation by the Insured

In instances where the insurer claims that an exception under the policy was violated the burden of proof is on the insurer to prove facts that the specified exception was violated. *Watson v. Jones,* 227 Kan. 862 (1980).  It is Scottsdale's burden to show that when viewing the facts in McReynolds' favor a clause was violated that terminated the policy.

In reference to determining whether the actions of an insured constitutes non-cooperation the Kansas Supreme Court stated:

> "The purpose of cooperation clauses is to protect the insurer's interest and prevent collusion between the insured and the injured, person. To that end, cooperation clauses are subjected to the common and ordinary meaning of the language contained therein, and not to a strained or technical construction. Lack of cooperation is a broad term. It may include fraud or collusion, but may also mean merely a refusal of the insured to do the acts required by the policy." *Watson,* 227 Kan. at 866-867 (1980).

### a. Non-Cooperation Allegations

Each specific allegation of non-cooperation is addressed separately by the court.  The pleadings indicate the parties do not dispute the applicability of the policy terms but contest whether actions or inactions taken by McReynolds constituted a breach of these clauses.

### *1. Sworn Examination Clause*

The policy McReynolds is enforcing requires her to submit to an examination under oath as often as Scottsdale reasonably requires. (Doc. 70, Ex. 48, Insurance Policy, p. 9, Section 1(B)(7)(c)).  The fire and damage giving rise to this claim occurred the evening of November 27, 2004.  On December 1, 2004, Mr. Bowker interviewed McReynolds.  On February 1, 2005,

independent adjuster, Mr. Scott undertook a taped interview with McReynolds. (Doc. 70, Ex. 36, and 37).  McReynolds was not under oath for these interviews.  McReynolds signed and submitted a Sworn statement of Proof of Loss.[6] (Doc. 70, Ex. 39).  McReynolds also signed and submitted a document titled "Access Authorization" for Mr. Bowker. (Doc. 70, Ex. 40).  This authorization allowed Mr. Bowker full access to her property to inspect and photograph the property.  McReynolds also gave an interviews to police and fire investigators a day after the fire and a second taped interview on February 2, 2005.

In a March 14, 2004 letter Scottsdale first formally gave notice of its intention of setting up an examination under oath to McReynolds. (Doc. 67, Ex. 14). In correspondence to Mr. Juhnke from Scottsdale dated April 15, 2005, Scottsdale requested releases of documents and stated that upon receiving these releases they would be able to set up an examination under oath. (Doc. 67, Ex. 16). On May 19, 2005, Scottsdale sent a follow-up regarding obtaining McReynolds' release information.  (Doc. 67, Ex. 17).  Again, Scottsdale sent a letter dated June 24, 2005, stating that this was a follow-up to their two previous release requests and that McReynolds had ten days to respond or suffer having the file closed due to either withdrawal of McReynolds' claim or a failure to cooperate.  (Doc. 67, Ex. 18).

On June 27, 2005, Mr. Juhnke responded by letter stating that McReynolds was not proceeding with her civil case while her criminal case was pending. (Doc. 67, Ex.19). McReynolds admits that she chose not to take the examination under oath while being aware of the requests. (Doc. 67, Ex. 2, 4/26/07 Dep. at 101).  Scottsdale communicated to McReynolds' in an August 8, 2005 letter that her response ultimately served as a denial to its requests for an

---

[6]This document is a cursory statement of the date of the loss, how the loss occurred, what coverage is, and a signed statement by McReynolds that the loss did not originate from any act of herself. (Doc. 70, Ex. 39).

examination under oath and resulted in a violation of this exemption clause.[7] (Doc. 67, Ex. 20). McReynolds' position is that her cooperation with other interviews substantively satisfied the examination clause's requirements.

### a. Arguments and Conclusion

The court finds that the un-controverted facts show that this clause was breached.  It is obvious from Scottsdale's correspondence that it was not going to set a time for an examination under oath until it received a release and reviewed this information.  Presumably, because Scottsdale would have wanted to ask questions that may have arisen after reviewing the information.  Numerous attempts were made to gain releases and McReynolds herself states that she knew she was violating the examination clause. (Doc. 67, Ex. 2, 4/26/07 Dep. at 101). Scottsdale's letter to Mr. Juhnke on August 8, 2005, communicated Scottsdale's conclusion that her actions violated the examination clause.  McReynolds provided no correspondence refuting this conclusion.

While her assistance and statements to Scottsdale and its agents may have been helpful, even to great lengths, they simply were not given under oath as the contract required.  Any cooperation with investigators McReynolds provided did not substantively satisfy the examination clause.

### 2.  Production of Documents or Signing of Releases

The insurance policy McReynolds is seeking to enforce also required the policy holder either provide documents requested by Scottsdale, or sign a release that would allow the plaintiff to gather these documents for itself.  (Doc. 70, Ex. 48, Insurance Policy, p. 9, Section

---

[7]   In a letter to Mr. Juhnke dated August 8, 2005, from Scottsdale's attorneys, Defendant's counsel was informed that his response was "construed as a refusal" by his client to "present herself for an examination under oath."

1(B)(7)(b)).[8]  Scottsdale alleges that over a course of nine months following the fire, numerous attempts were made by Scottsdale, or representatives from its independent adjustment company, to obtain the requested documents.

As the court has documented in the above section, (*supra* 1.Examination Under Oath) several attempts were made by Scottsdale to obtain requested releases to documents. Specifically, requests were made to inspect the insurance agent's file, the bank's file, and any statements McReynolds made. (Doc. 67, Ex. 16).  McReynolds admits that she chose not to release information from her insurance agent's file or the bank's records. (Doc. 67, Ex. 2, 4/26/07 Dep. p. 101).  Scottsdale maintains that these requests were formally refused by way of Mr. Juhnke's written correspondence referenced earlier (Doc. 67, Ex. 19) wherein he stated that McReynolds would not be proceeding with the civil case until the criminal case was resolved.

Scottsdale claims this refusal precluded it from collecting records to either support or disprove the arson accusations of Reno County authorities on behalf of McReynolds.  Scottsdale argues this information was essential to determining if McReynolds triggered the policy's exemption clauses for intentional losses or arson.

### a. Analysis and Conclusion

McReynolds testified on April 26, 2007 that she chose not to provide this information, even though she knew the plaintiff was requesting it.  The policy requires her to provide records and documents reasonably requested.  These requests were reasonable and clearly made with ample time to respond.  Scottsdale's letter to Mr. Juhnke on August 8, 2005, communicated

---

[8]   The actual language of the provision, "Section 1-Conditions (B)(7)(b)" only requires the production of documents, however Scottsdale's assertion that a signed release to allow Scottsdale to obtain the documents would also satisfy the clause is not disputed by any party.

Scottsdale's conclusion that her actions violated the production clause.  McReynolds provided

no response refuting this conclusion.  These facts establish McReynolds breaching the

production clause of the policy.

### 3.  Inventory of Personal Property

The policy also required the claimant to prepare a detailed property inventory list so that

the content portion of the claimed losses can be adjusted.  (Doc. 70, Ex. 48, Insurance Policy,

p.9, Section Conditions I(B)(6)).  In March 9, 2005, correspondence by Mr. Juhnke to

Scottsdale, Junkie indicated that it was his understanding that McReynolds had provided a

personal property list and that if any additional information was needed to contact him.  (Doc 67,

Ex. 13).  Scottsdale's March 14, 2005 response to Mr. Juhnke stated that it had not received the

personal property inventory. (Doc. 67, Ex. 14).

McReynolds contends that to her knowledge she had turned in her personal inventory list,

but could not remember precisely when she did and admits that the list submitted was going to

require continued cooperation with the insurance company to approximate and finalize. (Doc.

67, Ex. 2, 4/26/07 Dep. at 99) (Doc. 67, Ex. 15, 07/10/07, Dep. at 80).  Neither Scottsdale nor

their adjusters/investigators have any record of receiving a personal inventory.  No evidence was

presented that she or her counsel ever followed up on the personal property inventory that she

allegedly submitted.

 McReynolds maintains her only copies of the inventory she personally possessed were

destroyed in a fire at her parents' house.  In June, 2007, through discovery, McReynolds

submitted a copy of her personal property inventory after realizing her criminal attorney

possessed a copy.  (Doc.70, Ex. 41) (Doc.70, Ex.43).  Scottsdale contends that this delay resulted

in violating the terms of the policy since the information was necessary to evaluate her claim and was not actually received until after the suit was filed.

### a. Analysis and Conclusion

The confusion or error surrounding McReynolds' delinquent submission of her personal inventory has circumstantial evidence supporting her submitting the material for the first time long after the March 14, 2005 letter gave notice of its absence.  Nonetheless, viewing these facts in the light most favorable to McReynolds, a genuine issue does exist as to whether this clause was breached.  McReynolds has stated in her deposition that she personally mailed an inventory list to the adjusters. (Doc. 70, Ex. 42 at 20.ln.5-11).   The absence of the inventory could have been the result of Scottsdale or its agents' administrative error(s).  Moreover, even though follow-up on the inventory by McReynolds would have been prudent, it is not unreasonable to conclude an insured would not follow-up without first being prompted a second time by the insurance company.[9]

Viewing the facts in McReynolds' favor there could be a genuine issue of material fact regarding her submission of the personal inventory in compliance with the personal inventory clause and thus the facts do not as matter of law satisfy a breach of this clause under the summary judgment standard.

### B.  Non-Cooperation and Substantial Prejudice

---

[9] An insured's reluctance to follow-up is more likely under the circumstances here, where the insured had other disputes with their insurance company that were suspending payments under the policy claim.  If McReynolds were simply waiting on payment from Scottsdale her expectation to follow up would be greater, but here Scottsdale's investigation was ongoing and there is no evidence that the insurance company contacted her again to let her know it still had yet to receive the inventory.  Unlike the other two clauses the court has found she violated, McReynolds does not state she knew she violated the personal inventory clause, but rather states that she did comply with personal property inventory clause.   (Doc. 70, Ex. 42, at 20.ln.5-11).

Under Kansas law, an insured's failure to cooperate with the insurer will not preclude recovery unless the insured's breach causes substantial prejudice to the insurer.  *See Boone v. Lowry,* 8 Kan.App.2d 293, 657 P.2d 64, *rev. den.*, 232 Kan. 875 (1983).  Having found a breach by McReynolds of two of the contract's cooperation clauses, the court now must determine whether these breaches resulted in "substantial prejudice" to Scottsdale.  The court must determine if the insured's breach of cooperation "cause[d] substantial prejudice to the insurer's ability to defend itself." *Boone,* 8 Kan.App.2d at 299 (citing *Jameson v. Farmers Mutual Automobile Ins. Co.,* 181 Kan. 120, 309 P.2d 394 (1957))(emphasis added); *see also Youell v. Grimes,* 217 F.Supp.2d 1167 (D.Kan.2002).

Evidence of substantial prejudice can not be "speculative." *Boone,* 8 Kan.App.2d at 302. "An insurer's burden of showing prejudice from a breach of a cooperation clause by insured is not sustained by a showing of possible prejudice."  *Id.; see also King v. Federal Ins. Co.*, 788 F.Supp. 506 (D.Kan. 1992) (Court found that while records withheld were "material" and would have been "helpful," "[n]o evidence of any kind was produced that the plaintiff's failure to give up the records prejudiced defendant's defense once the suit was filed  . . . ").  To show prejudice, insurer must demonstrate a substantial likelihood that, had the insured fully cooperated, the trier of fact would have found for the insured.  *Boone* 8 Kan. App. 2d at 293; *see also* 3 Law and Prac. of Ins. Coverage Litig. § 36:20.

### a. Substantial Prejudice Analysis

### *1. Examination Clause*

Scottsdale alleges its ability to assess the insurance claim was substantially prejudiced because McReynolds failed to provide an examination under oath and/or produce certain

documents or a releases for documents.[10]  (Doc. 67 at 19).  It is Scottsdale's burden to establish there are no genuine issues of material fact with regard to its incurring substantial prejudice in defending itself and investigating the claim.

First, McReynolds' failure to testify under oath was alleged to have prejudiced Scottsdale's ability to adjust the claim.  (Doc. 67 at 21).  Specifically it alleges that through interviews more recently conducted that the defendant could not recall numerous details about the fire and the investigation.  (Doc. 67 at 22-23).  Since this action commenced McReynolds has submitted to depositions before Scottsdale.  The record before the court shows nothing material that was specifically left unanswered.  Scottsdale cites no evidence that was spoiled, material information that was absent, or witnesses that were lost.  It fails to communicate to the court how its suffered actual prejudice from not undertaking the sworn examination.  *See Youell*, 217 F.Supp.2d at 1178 (D.Kan.2002) (court relieved duty of insurer upon finding the insurer sustained substantial prejudice where the insured's actions eliminated its ability to negotiate a lower settlement with the injured party making a claim against the insured.).

Secondly, Scottsdale alleges McReynolds' breach of the examination clause prejudiced it because it was unable to "make inquiries into the defendant's state of mind immediately after the fire because of the defendant's refusal to cooperate." (Doc. 67 at 22).  Scottsdale adds that by the time it took her deposition, "the facts surrounding the investigation and criminal charges filed against the defendant, had substantially changed."  (Id.).

Scottsdale admits that McReynolds had been cooperative at the beginning of their

---

[10]   Because the court has found that for the purpose of summary judgment McReynolds failure to provide a personal property inventory did not amount to non-cooperation as a matter of law the court will only consider allegations of substantial prejudice as it relates to the absence of an examination under oath and McReynolds' failure to provide releases to documents.

investigation. (Doc. 67 at 21).  Through Crawford, Scottsdale had conducted two interviews previous to its request for an interview under oath.[11]   No evidence is presented that McReynolds was uncooperative in the earlier interviews or refused to answer any questions.

Moreover, the record indicates Scottsdale's request for sworn testimony did not occur until roughly five months after the date of the fire.  The April 15, 2005 letter was only a notice of its intent to later contact her to set up an examination.  It was not until after McReynolds' failure to provide releases that any suspicion of her non-cooperation could arise or that Scottsdale could have had an expectation to conduct a sworn examination.

Viewing these facts in McReynolds favor, the court cannot conclude that McReynolds' "state of mind immediately after the fire" necessarily would have been much more discernable from a deposition taken 5 months after the fire than it would have been two years later.  Additionally, Scottsdale's briefs do not articulate how the facts and circumstances substantially changed from when an interview might have been undertaken to when her deposition was taken in 2007.  Obviously, circumstances changed in the fact that the criminal charges in Reno County were dismissed, yet Scottsdale does not state how interviewing her after this actually prejudiced it.

A genuine issue of material fact remains regarding whether Scottsdale incurred substantial prejudice as a result of McReynolds not testifying under oath.

### b.  Disclosure Clause

Scottsdale also claims to have been prejudiced through McReynolds not signing a release or providing documents.  On these grounds Scottsdale asserts it was prejudiced because it was

---

[11] McReynolds believed her taped interview with adjusters on February 1, 2005  was under oath.  (Doc. 70, Ex. 42, p, 20, ln.5-11).

19

"not privy to a substantial amount of information surrounding the fire and criminal charge" which may have provided evidence as to motive and/or proof of arson.  (Doc. 67, at 15, 22).  With the exception of financial records, Scottsdale does not point to any specific information in its motion (Doc. 67 at 21) that it attempted to retrieve but could not obtain.  Scottsdale's brief concludes that the financial information "may or may not" have been helpful to its investigation.

Speculation is not sufficient for a showing of prejudice.   Scottsdale fails to specifically point to how the absence of this information effectively prejudiced it in defending itself or investigating the claim.    Scottsdale largely relies on broad, speculative and conclusory statements to support its argument that the breaches of McReynolds prejudiced it.   Scottsdale fails to put forth evidence showing actual substantial prejudice from not receiving documents.

McReynolds' overarching defense to Scottsdale's claims of prejudice is that Scottsdale had intended to deny her claim regardless of any additional information that may have been provided from these requests. (Doc. 70 at 23-24).  It is McReynolds' contention that since they were going to deny her claim that  her alleged lack of cooperation could not have prejudiced Scottsdale.  (Id).

Viewing the facts in McReynolds' favor, the facts support McReynolds' position.  McReynolds was the sole known witness to her home's fire.  Her version of the events appear suspicious when coupled with the Reno county charges of arson, the conclusion of the Fire Marshal, and her history of mental issues and false accusations.  Cumulatively a substantial likelihood exists that her claim would be denied regardless of her full cooperation of the claim.

The court's conclusion is reinforced by Scottsdale's letter officially denying McReynolds claim, dated January 16, 2006, wherein the letter states that "[t]he preponderance of the

*available* evidence reveals that you intentionally caused the loss." (Doc. 70, ex. 35)(italics

added).  The letter goes on to state that "[d]ue to your non-compliance with your policy duties as

described herein, and due to Exclusion 8 [intentional loss clause] as described above. Scottsdale

Insurance Company has no duty under the policy to provide coverage for your loss.  Therefore,

your claim is denied."

Scottsdale states in the letter that it was refusing her claim, at least in part, due to its

belief that the "available" evidence showed McReynolds intentionally caused her loss.  These

facts imply that Scottsdale's refusal of the claim was inevitable regardless of her releasing

documents or being examined under oath.  *See King* 788 F.Supp. 506  (Court found an absence

of substantial prejudice where material information was withheld that would have been helpful

but would not have effected the carrier's decision to deny the claim.).  The courts therefore

concludes that, a genuine issue of material fact remains as to whether McReynolds'

nondisclosure of certain documents substantially prejudiced Scottsdale.

Scottsdale's actions failed to establish substantial prejudice as a matter of law.  Summary

judgment is inappropriate and it will be left to the trier of fact as to whether Scottsdale has been

prejudiced so that as to receive it of its obligation to afford coverage.  *See Cessna Aircraft Co. V.

Harford Acc. & Indem. Co.,* 900 F.Supp. 1489, 1518 (D.Kan. 1995) (Court found uncontroverted

breaches of multiple insurance clauses did not warrant removing insurer of liability due to the

insurer's failure to prove substantial prejudice as a matter of law) .  Scottsdale's motion for

summary judgment (Doc. 67) is DENIED.

## II. McREYNOLDS MOTION FOR SUMMARY JUDGMENT

McReynolds' motion for summary judgment (Doc. 66) argues that Scottsdale has the burden of proving arson by McReynolds and that the uncontroverted facts fail to provide such proof.  Additionally, McReynolds' motion asserts that she need only show that her policy covers home loss by fire to be paid under the policy and granted summary judgment. (Doc. 66).

## A.  Standard of Review

As was stated earlier, where a party moves for summary judgment the nonmoving may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241. "[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving parties' evidence is merely colorable or is not significantly probative.  *Anderson,* 477 U.S. at 250-51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251-52.[12]

Ultimately, Scottsdale's defense is that it owes no coverage under the contract due to the contract's exclusion clauses for intentional loss and non-cooperation by the insured.  Thus, any granting of summary judgment would require that the evidence viewed in the light most favorable to Scottsdale to show that no genuine issue of material fact exists as to McReynolds intentionally causing the fire and/or her alleged non-cooperation with the insurance company resulting in substantial prejudice to Scottsdale.

## B.  Arguments

─────────────────

[12]  *See supra* II. Standard Summary Judgment, p.4 for additional citations.

McReynolds must show there are no genuine issues of material facts regarding non-cooperation and intentional loss and that the contract should be enforced as a matter of law. Specifically, McReynolds argues that no expert can testify at trial that the fire was the result of arson due to Scottsdale's non-compliance with Fed. R.Civ.Pro. 26(a)(2)(A), and consequently excludes grounds to argue arson. See *Adams v. American Guarantee and Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). *See also Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) ('It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment.') (quoting *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995))

Scottsdale responds that there is evidence supporting the presence of arson and that regardless of expert designations genuine issues of material facts exist precluding summary judgment.[13]   (Doc. 66).

**C.  Conclusion.**

In viewing all facts in Scottsdale's favor, it is evident that there are a number of issues of material fact remaining with regard to allegations of non-cooperation and intentional loss by McReynolds that may void the policy.  The Court does not find it necessary to address the admissibility of any expert testimony since adequate issues of material fact exist irrespective of the disputed expert testimony.

First, McReynolds' made statements to police, and confirmed in her testimony, that she was not 100% sure that she did not start the fire.  If the moving party for summary judgment is

---

[13]  Scottsdale does not agree with McReynolds' position that expert testimony is inadmissible.

not absolutely sure she did not violate the policy then the court certainly cannot find in her favor in a summary judgment motion.

Additionally, the circumstances described by McReynolds whereupon the fire began are quite suspicions when viewed in the context of additional facts, such as: (1) that there were no witnesses except McReynolds to corroborate her version of the events, (2) she puts forth no motive in her motion that the alleged perpetrators may have had to kill her or burn down her house, (3)  McReynolds has a history of self destructive behavior during times of emotional stress[14], (4) she admitted to police that her clothes emanated an odor of the very accelerant that she believes started the fire, and (5) in the past she has made false claims to police.

All of these facts are uncontroverted and raise a genuine issue of material fact as to whether the fire was directly or indirectly caused by McReynolds and consequently, whether the policy is enforceable.

Despite the court denying Scottsdale's motion for summary judgment, the ruling only concluded that upon viewing the facts in McReynolds' favor a genuine issue of material fact remained regarding Scottsdale being substantially prejudiced by her breaches.  The ruling on Scottsdale's motion (Doc. 67) was not a finding of an absence of substantial prejudice as a matter of law.  Conversely, on this motion by McReynolds (Doc. 66), where the fact are viewed in Scottsdale's favor, there remain issues of material fact as to whether McReynolds' cooperation failures substantially prejudice Scottsdale.

---

[14]  Her and her boyfriend had recently broken up and the night of the fire he moved the last of his stuff from her home.  The two broke up earlier that month and he had contributed $200 to her while staying at her house.  This could reasonably impart stress on an individual.

The court finds that in viewing the facts in the favor of the nonmoving parties that both motions for summary judgement leave genuine issues of material fact that should be left to a trier of fact to determine.    THEREFORE, it is this Court's ruling that Scottsdale's Motion for Summary Judgment (Doc. 67) and McReynolds' Motion for Summary Judgment (Doc. 66) are DENIED.  It is so ORDERED on this 21st day of October, 2008.

    s/Wesley E. Brown
WESLEY E. BROWN
U.S. Senior District Judge